E-filing

FILED

APR 1 2 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VAN M.. WASHINGTON, | No. C 03-1777 WHA (PR) |
| Petitioner, | **DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| DAVID L. RUNNELS, Warden, | |
| Respondent. | |

## INTRODUCTION

This is a habeas corpus case filed by a state prisoner pursuant to 28 U.S.C. 2254. As grounds for habeas relief petitioner alleges that by denying his motions for substitute counsel the trial court impinged on his constitutional rights; that his conviction was based upon insufficient evidence; and that his sentence violated his Eighth Amendment right against cruel and unusual punishment. For the reasons set forth below the petition is **DENIED**.

## STATEMENT

Sometime in early March of 2000, petitioner and the victim, Ann Mayfield, rented a room in a home owned and occupied by Maria Caillas. On March 5, 2000, petitioner and Mayfield argued. During the argument Mayfield felt ill and lay down, whereupon petitioner struck her in the face with a cellular phone. He then ordered her to prepare a meal for him. As petitioner ate the meal that Mayfield had prepared he muttered that "this fork looks interesting for stabbing you in the stomach" (Exh. 2 at 226).

The next day Casillas asked Mayfield where she had received the black and blue mark

on her right cheekbone. Mayfield lied to Casillas and said she had hit her head on a door.

On March 15, 2000, Mayfield attended a court appearance in a matter unrelated to the present one. Petitioner had advised Mayfield to file a motion that day asking for different counsel, and had prepared it for her. She did not file it. Upon learning this, petitioner became enraged that Mayfield had disobeyed him. During the ensuing argument Mayfield informed him that she intended to move back home with her mother. Petitioner replied that "nobody leaves him" and that "he would make sure that [Mayfield] was dead" (*id.* at 228). He then grabbed Mayfield by the ear and pulled her into their room.

Mayfield testified that as they continued to argue petitioner "made this threat when he was going outside, out of the room that he should go get his gun from his car so he can shoot me. I'll shoot you in the stomach and to the head" (*ibid.*). Petitioner then left the room. Pregnant, Mayfield understood this threat to be a threat to herself and her unborn child.

Terrified, Mayfield asked Casillas to use the phone in her bedroom. Casillas testified that Mayfield was crying and trembling (*id.* at 192–93). Mayfield locked herself in Casillas' bedroom and called 911. She told the dispatch operator that petitioner had threatened to blow her head off and she was afraid that he would return with a gun and kill her. Mayfield remained on the line with the operator until the police arrived.

One of the responding officers testified that Mayfield was upset and "clearly afraid" (*id.* at 308). The officer also testified that petitioner was "defiant, profane, cussing, swearing, threatening" (*id.* at 314). Petitioner was placed under arrest and led to a police vehicle. He resisted the officer's attempts to place him in the vehicle, banging his head against the vehicle and yelling "stop beating me" in an attempt to make it appear as if the police had assaulted him (*id.* at 298–300, 311).

Petitioner waived his right to a jury. On December 11, 2000, the trial court convicted him of felony injury on a cohabitant, felony threats to commit a crime resulting in death or great bodily injury, and misdemeanor resisting or obstructing a peace officer. Petitioner had two prior serious felony convictions within the meaning of California's three strikes law and was sentenced to fifty years to life.

2

United States District Court
For the Northern District of California

## ANALYSIS

### A. Standard Of Review

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. 2254(d).

The first prong applies both to questions of law and to mixed questions of law and fact. *Williams v. Taylor*, 529 U.S. 362, 407–09 (2001). The second prong applies to decisions based on factual determinations. *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of Section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. A state court decision is an "unreasonable application of" Supreme Court authority, and thus falls under the second clause of Section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A federal court on habeas review may not issue a writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340. This presumption is not altered by the fact that the finding was made by a state court of appeal, rather than by a state trial court.

1  *Sumner v. Mata*, 449 U.S. 539, 546–47 (1981). A petitioner must present clear and convincing
2  evidence to overcome Section 2254(e)(1)'s presumption of correctness; conclusory assertions
3  will not do. *Ibid.*

4  Under Section 2254(d)(2), a state court decision "based on a factual determination will
5  not be overturned on factual grounds unless objectively unreasonable in light of the evidence
6  presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.

7  When there is no reasoned opinion from the highest state court to consider the
8  petitioner's claims, the court looks to the last reasoned opinion, in this case that of the
9  California Court of Appeal. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801–06 (1991).

**B.    Claims Presented**

   **1.    *Marsden* Motions**

Petitioner claims that the trial court's denial of his motions for new counsel violated his constitutional rights.

The state procedure for dealing with such motions was set out in *People v. Marsden*, 2 Cal. 3d 118 (1970), so in state court such motions are called "*Marsden* motions." But a petitioner can obtain federal habeas relief only for a violation of federal law, usually the Constitution, so the question here is not whether *Marsden* was complied with, but rather whether petitioner's Sixth Amendment right to effective assistance of counsel was violated. This right includes a right to have the trial court conduct an appropriate inquiry into the grounds for a request for appointment of new counsel, similar to the *Marsden* requirement, *see Schell v. Witek*, 218 F.3d 1017, 1025, 1027 (9th Cir. 2000), but most importantly, a right not to be represented by an attorney with whom the defendant is in "'irreconcilable conflict,'" *Daniels v. Woodford*, 428 F.3d 1181, 1197 (9th Cir. 2005) (quoting *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970)).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." The United States Supreme Court has said:

> [T]he purpose of providing assistance of counsel is simply to ensure that criminal defendants receive a fair trial, and that in

4

> evaluating Sixth Amendment claims, the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such. Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

*Wheat v. United States*, 486 U.S. 153, 159 (1988) (citations omitted).

The Ninth Circuit has stated:

> The Sixth Amendment grants criminal defendants a qualified constitutional right to hire counsel of their choice but the right is qualified in that it may be abridged to serve some compelling purpose. A criminal defendant's exercise of this right cannot unduly hinder the fair, efficient and orderly administration of justice.

*United States v. Walters*, 309 F.3d 589, 593 (9th Cir. 2002) (citations omitted).

A trial court must further be "wary against the right of counsel being used as a ploy to gain time or effect delay." *United States v. Kelm*, 827 F.2d 1319, 1322 (9th Cir 1987).

In evaluating a denial of a motion for new counsel, a court must consider factors such as "the timeliness of the motion, the adequacy of inquiry into the defendant's complaint, and whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense." *Hudson v. Rushen*, 686 F.2d 826, 829 (9th Cir. 1982).

Even assuming that all of petitioner's motions were timely, a review of each inquiry performed by the trial court shows that those inquiries were not only adequate but thorough, and that the conflict between petitioner and his counsel was not so great as to prevent counsel form rendering effective assistance.

      **a.    June 30, 2000 Motion**

On June 30, 2000, during his preliminary hearing, petitioner filed a *Marsden* motion seeking to replace attorney Thomas Spielbauer (Exh. 2 at 18–19). The trial court inquired as to the basis of his dissatisfaction with Spielbauer, to which petitioner responded that he "wanted to say something as far as my child is concerned" (*ibid.*). The court informed petitioner the he should try to "work these things out" with counsel (*ibid.*). In agreement, petitioner stated that,

5

1   that was "good advice" and he would "go with that" (*ibid.*). As petitioner agreed there was no
2   irreconcilable conflict, and agreed to work things out, the relationship between counsel and
3   client clearly had not deteriorated to the point where counsel could not be effective. There was
4   no constitutional violation.

5   On July 26, 2000, Spielbauer declared a conflict for reasons not on the record, and
6   withdrew from representing petitioner. Petitioner was assigned Steven Bermudez from the
7   Alternate Defender's Office to represent him.

### b.      October 18, 2000 Motion

On October 18, 2000, petitioner sought to remove Bermudez. The court conducted a *Mardsen* hearing in order to ascertain petitioner's grounds for removal. During this hearing the court had to remind petitioner on numerous occasions to "focus on Mr. Bermudez" as petitioner was "rambling all over" (*id.* at 40, 42). Petitioner complained that Bermudez failed to: file a motion for speedy trial, file a motion to dismiss, contact the defendant's witnesses; get evidence from the crime scene, reduce petitioner's bail, and file a letter with the three strikes committee (*id.* at 43–44).

After soliciting responses from Bermudez to each of petitioner's allegations, and receiving extensive responses, the court told petitioner that "I don't know that anybody can tell you anything that's going satisfy you . . . [Bermudez] has a reputation. He's a good attorney" (*id.* at 68–69). The court conceded that petitioner and Bermudez might have been experiencing some communication problems, but attributed these problems to petitioner's frustration (*id.* at 72). Petitioner admitted that he had turned Bermudez away on occasion, and apologized to Bermudez (*id.* at 72–73). When pressed by the court whether he really wanted to discharge Bermudez, petitioner responded that he did not and withdrew the *Marsden* motion (*ibid.*).

Since petitioner withdrew this motion, it is clear that the relationship had not broken down to the extent that counsel could not render effective assistance.

### c.      November 8, 2000 Motion

On November 8, 2000, petitioner filed another *Marsden* motion. Petitioner's motion was approximately one month before trial, so granting it probably would have required a

6

continuance. "[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." *Morris v.* Slappy, 461 U.S. 1, 11–12 (1983).

The court inquired whether petitioner had made a *Marsden* motion previously, to which petitioner replied that he "had to do it several times" (Exh. 2 at 78). When asked if there was a new basis for this motion, petitioner stated that "[i]t's basically the same thing," but because petitioner had withdrawn his prior *Marsden* motions, the court heard the motion on the merits (*id.* at 78–79).

The trial court's inquiry as to the basis for petitioner's dissatisfaction with counsel was more than adequate. The court first listened to petitioner allege that his counsel had failed to investigate and interview numerous witnesses, that he did not obtain court transcripts from petitioner's 1994 conviction and that he had failed to investigate the victim's miscarriage and rashes (*id.* at 82–93). After hearing petitioner's complaints the trial court proceeded at length to solicit information from petitioner's counsel, Bermudez.

In response to the alleged failure to contact witnesses, Bermudez replied that he had in fact located and investigated nearly all of the witnesses mentioned by petitioner. Bermudez added that some of the witnesses simply did not exist, had nothing relevant to add, or he had no knowledge of their existence until the hearing (*id.* at 99–109). As to the victim's miscarriage, Bermudez felt that it was not relevant to petitioner's case, moreover, the victim had not attributed her miscarriage to petitioner's actions and for Bermudez to introduce the miscarriage at trial would be greatly detrimental to petitioner's case (*ibid.*).

Petitioner failed to show that the alleged conflict with counsel was so substantial as to prevent counsel from giving effective assistance. Bermudez had met with petitioner approximately ten times since his appointment (*id.* at 113). The court noted that Bermudez had provided the petitioner with discovery information and transcripts of court proceeding (*id.* at 110–111). Bermudez stated that petitioner was subject to "histrionics, and [that] he gets very emotional and very excited when talking about the case" and every time that he saw the

7

1  petitioner he was given new information that he had to review for relevance (*id.* at 114).

2  It was not unreasonable for the trial court to conclude that the relationship had not
3  broken down to the point where counsel could not provide constitutionally-adequate
4  representation.

### d. December 4, 2000 Motion

Petitioner filed another *Marsden* motion on December 4, 2004. During the *in camera* hearing, and in response to the court's inquiry, petitioner stated that his relationship with Bermudez had been impaired because Bermudez had lied to him and failed to do anything regarding his case (Exh. 2 at 129). In addition petitioner alleged that Bermudez refused to file a report with the district attorney's office or Child Protective Services regarding the victim's unfitness as a parent and had failed to interview his former wife and the victim's doctors (*id.* at 128–29, 134–35).

The court questioned Bermudez about these alleged deficiencies in his representation, and about all preparations for trial that he had done to date. Bermudez replied with a list of numerous witnesses that had been contacted and records that had been collected (*id.* at 130–33). Bermudez also stated that the victim was already under investigation from Child Protective Services and that he had no grounds for interfering with her parental rights (*ibid.*). As to petitioner's ex-wife, Bermudez informed the court that she was unwilling to cooperate with investigators (*id.* at 134–35). The trial court was entirely reasonable in concluding, after a thorough inquiry, that petitioner's conflict with Bermudez that was not so substantial as to prevent him from giving effective assistance.

### e. December 5, 2000 Motion

The next day, December 5, 2000, the first day of trial, petitioner made another *Marsden* motion. In response to the inquiry by the trial court, petitioner said that he was concerned that Bermudez had failed to perform an adequate investigation into all of the witnesses and was not planning to use the testimony of Jacob Daniels and Renee Robinson (*id.* at 140–44).

Bermudez told the court that he had determined after investigating the other witnesses that they had nothing relevant to add to the case or were unreachable (*id.* at 157–60, 166).

8

When asked by the court about his decision not to call Daniels or Robinson, Bermudez replied that Daniels refused to cooperate with investigators because of pending criminal charges (*id.* at 154–55). As to Robinson, Bermudez stated that her testimony did not help petitioner's case and was not going to be admissible as it consisted primarily of hearsay (*id.* at 151). Bermudez did inform the court that he had tried to locate the source of Robinson's testimony, however his investigative efforts had failed (*ibid.*). When asked by the court if he could work with Bermudez to help locate this possibly important witness petitioner responded "[y]es, I can" (*id.* at 153). Finally, at the conclusion of the courts lengthy and comprehensive inquiry, petitioner stated to Bermudez that "I love you, as long as I know that I have a fighting chance" (*id.* at 171). Clearly communications between petitioner and Bermudez had not broken down to the point of preventing Bermudez from effectively representing petitioner.

### f. December 6, 2000 Motion

On December 6, 2000, petitioner made still another *Marsden* motion to "buy a little time" in order to "have a few extra witnesses" investigated (*id.* at 182). Petitioner admitted that he had already given the names to Bermudez, who had stated that the witnesses would be more damaging to petitioner then helpful; however, petitioner wanted the witnesses to testify "even if it hurted [sic] me" (*id.* at 183). Petitioner did not make any allegations that communications with Bermudez had failed, to the contrary, petitioner stated that "I understand Steve [Bermudez], what Steve is saying" (*ibid.*). Petitioner, by his own admission, was using the *Marsden* procedure to stall the trial. That is, he brought it not because relations with counsel had broken down, but for an improper reason. The trial court was entirely reasonable in denying petitioner's motion.

### g. December 7, 2000 Motion

The next day, December 7, 2000, petitioner made yet another *Marsden* motion. Petitioner stated that he "didn't intend for a *Marsden*" and that he "wanted to speak on a couple of witnesses," specifically Daniels and Robinson (*id.* at 318). Petitioner sought the court's opinion as to the merits of the alleged testimony that Daniels and Robinson would provide, even after Bermudez had advised him that Daniels' statements were not helpful, that Daniels would

9

1  exercise his Fifth Amendment right to remain silent, and that Robinson had called into question
2  his already dubious credibility by contradicting an earlier letter he had written (*id.* at 318–20).
3  As petitioner delved into the reasons why Robinson had changed his testimony, the court told
4  petitioner that he should listen to his attorney and that petitioner was "telling him things that
5  may or may not be beneficial to your case" (*id.* at 321–26). It was not unreasonable for the
6  court to conclude that the relationship between counsel and client had not broken down to such
7  an extent that counsel could not render effective assistance (*id.* at 326–27).

### h.   March 2, 2001 Motion

Petitioner called for another *Marsden* hearing after trial. He complained that Bermudez had not filed papers in dependency court, that he had withheld discovery information, and that he failed to call witnesses to the stand (*id.* at 414–15).

In response to the court's inquiry Bermudez stated that he had no jurisdiction to file the papers that petitioner had requested, as that was the duty of the dependency courts, and that he had provided petitioner with copies of everything, or told him verbally of their contents (*id.* at 425–28). As to the witnesses, Bermudez stated that he was not able to locate Dr. Mohammad since petitioner was unable to produce sufficient information regarding his whereabouts. As to the other witnesses Bermudez had made a tactical decision not to call them as they provided testimony that was of little to no relevance and damaging to petitioner's case (*id.* at 427–28). The court was not unreasonable in concluding that plaintiff had failed to show such a failure of communication that counsel could not be effective (*id.* at 436).

### i.   March 23, 2001 Motion

On March 23, 2001, petitioner filed the last of his *Marsden* motions. When asked by the court what his complaints against his attorney were, petitioner stated again that Bermudez failed to interview all the witnesses, and failed to provide him with discovery (*id.* at 444–58). The court, having heard these allegations on numerous prior occasions, informed the petitioner that "one of your problems is . . . you're not willing to listen to Mr. Bermudez" (*id.* at 456).

Bermudez reiterated, as he had done on prior occasions, that the witnesses petitioner wanted him to call were all investigated and had nothing relevant to provide, or were not

10

percipient witnesses and merely had hearsay testimony (*id.* at 461–63). The court stated that they had been "through these issues over and over again" and that the difficulty lay in petitioners "inability to listen to the advice given by Mr. Bermudez" (*id.* at 469–71). The court's denial of the motion because petitioner had failed to show a breakdown in communication was not unreasonable.

### j. Conclusion

The trial court showed remarkable patience in performing extensive and exhaustive inquires into the basis for each of petitioner's nine motions. The record provides ample evidence that petitioner's relationship with Bermudez never deteriorated to the point were it resulted in a total lack of communication preventing an adequate defense. It is clear that petitioner was a difficult client to represent, and it was his inability to listen to and comprehend his attorney's tactical decisions that led to some of the motions, while others were withdrawn or were made for reasons other than a breakdown of communication.

The Sixth Amendment requires only competent representation; it does not guarantee a meaningful relationship between petitioner and his counsel. *Morris,* 461 U.S. at 13–14. The state appellate courts' rejection of this claim was not contrary to, nor an unreasonable application of, clearly established Supreme Court authority.

### 2. Evidentiary Sufficiency

Petitioner contends that the evidence is insufficient to support his conviction for making a threat to commit a crime resulting in death or great bodily injury, a violation of California Penal Code Section 422. This claim was not included in the petition for review to the California Supreme Court, so it is not exhausted. An application for writ of habeas corpus may be denied on the merits, however, notwithstanding the failure of the applicant to exhaust the remedies available in state court. 28 U.S.C. 2254(b)(2). Because petitioner's claim is without merit, the Court may address it.

In collaterally reviewing a state court conviction for sufficiency of evidence, a federal court does not determine whether the prosecution established the petitioner's guilt beyond a reasonable doubt. The federal court "determines only whether, after viewing the evidence in the

11

light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992) (emphasis in original). A conviction that fails to meet the aforementioned standard violates due process and entitles the convicted defendant to habeas relief. *Id.* at 319. Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction. *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992). The prosecution need not affirmatively "rule out every hypothesis except that of guilt." *Jackson v. Virginia*, 443 U.S. 307, 326 (1979).

      The elements of the crime of criminal threats are: (1) that the defendant willfully threatened to commit a crime which would result in death or great bodily injury to another person; (2) that the defendant made the threat with the specific intent that the statement be taken as a threat, even if there was no intent to actually carry it out; (3) that the threat was so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat; (4) that the threat actually caused the person threatened to be in sustained fear for his or her own safety; and (5) that the fear was reasonable under the circumstances. *See People v. Toledo*, 26 Cal.4th 221, 227–28 (2001).

      Mayfield testified that after coming home petitioner engaged her in an argument. During the course of this argument petitioner told her that "he should go get his gun from his car so he can shoot [her]" (Exh. 2 at 228). Petitioner denied saying that he was going to fetch his gun to shoot Mayfield, but admitted to intentionally making threatening statements to Mayfield and that he "scared her" (*id.* at 373–74, 382, 394). After petitioner threatened Mayfield, she observed him exiting their home towards his car (Exh 2 at 230). Upon seeing petitioner leave to go his car, Mayfield called 911, apparently fearing that petitioner would return with a gun and execute the threat. In addition, Mayfield testified that she "was stunned, I was wow. As soon as I had the chance, I knew I had to leave" (*id.* at 229). The court of appeal also stated that "Mayfield's tone of voice on the 911 tape call is that of a terrified person on the verge of panic" (Exh. 6 at 12). Casillas, a percipient witness, testified that Mayfield was crying and trembling

12

while placing the call (Exh. 2 at 192–93). The responding officers also noted that Mayfield was upset and "clearly afraid" (*id.* at 308).

A federal habeas corpus court when faced with a record of historical facts that support conflicting inferences, such as the conflicting testimony of Mayfield and petitioner as to whether petitioner actually made the threat, must presume that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. *Jackson*, 443 U.S. at 326. Here it is apparent that the trial court found Mayfield's account of the threat more credible then petitioner's. The finder of fact's credibility determinations are entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004). There was sufficient evidence on the record to support the conclusion that petitioner was guilty of making a criminal threat.

After the passage of the Anti-terrorism and Effective Death Penalty Act in 1996, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). The habeas court merely asks whether the operative state court decision was an unreasonable application of *Jackson* to the facts of the case. *Id.* 1275. Given that there was in fact sufficient evidence to support the result, and thus no constitutional violation, the state appellate courts' rejection of that claim was not contrary to, or an unreasonable application of, clearly established Supreme Court authority.

### 3. Eighth Amendment

Petitioner contends that his sentence of fifty years to life violated the Eighth Amendment's prohibition of cruel and unusual punishments. The sentence took into account petitioner's two prior strike convictions, both for attempted first-degree burglary (Exh. 1 at 118). In addition petitioner has five other felony convictions, which include convictions for false imprisonment, burglary, and possession of cocaine (*id.* at 123).

The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate to the crime." *Ewing v. California*, 538 U.S. 11, 23 (2003). The Eighth Amendment does not

13

preclude a state from making a judgment that protecting the public safety requires incapacitating criminals who have already been convicted of at least one serious or violent crime, as may occur in a sentencing scheme that imposes longer terms on recidivists. *Id.* at 29.

In reviewing a California three strikes sentence, the Supreme Court in *Lockyer v. Andrade* upheld the petitioner's two consecutive terms of twenty-five years to life for petty theft with three prior convictions for residential burglary. The court reasoned that the grossly disproportionate standard is the only clearly established law relevant to adjudicating petitions for habeas relief under the AEDPA, and given the petitioner's prior convictions and his recidivist nature, the sentence was not grossly disproportionate. *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003).

Petitioner's convictions -- for felony injury on a cohabitant and felony threats to commit a crime resulting in death or great bodily injury -- are for crimes much more serious than the two shop-lifting offenses in *Andrade*. His record is also worse -- seven prior felony convictions and twenty-eight prior misdemeanor convictions. Thus, given Supreme Court precedent, the seriousness of the crime, and petitioner's criminal record, petitioner's sentence of fifty years to life was not "grossly disproportionate" to the offense. Petitioner's claim is without merit. The state appellate courts' rejection of petitioner's argument was not contrary to, or an unreasonable application of, clearly established Supreme Court authority.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: April 12, 2006.

G:\PRO-SE\WHA\HC.03\WASHINGTON777.RUL

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

14